H. E. Jackson,
Special -Judge, delivered the opinion of the court.
The plaintiff in error, and Quitman Eitzgerald, were jointly indicted at tlie. September -term, 1874, of tlie circuit oourt -of Henry county, for the murder of J. J. Jordan. At the same term of said court, on the application of defendants, the venue was changed to Weakley county, and at the October term, 1874, of the- circuit court of Weakley county, they were tried.
Quitman Fitzgerald being acquitted, and the plaintiff in error found guilty andvconvicted of murder in the second degree, and bis term of imprisonment fixed at fifteen years.
His motion for a new trial, -and in arrest of judgment having been overruled, lie appealed to this court, and by bis counsel, has assigned various errors as grounds of reversal.
Amongst others, it is insisted for the prisoner, that the oourt below erred in admitting the evidence of Dr. Porter, as to a certain declaration made by Jordan after he was shot. Dr. Porter, -after stating that Jordan said lie would die, “stated that he heard a conversation with Jordan and *507 others about the difficulty, and that he remembered but oue expression of Jordan’s; that he remembered ‘t>he substance of that one expression.’ ” The prisoner objected to the witness stating the substancq of that one expression without giving the whole conversation; the court overruled the objection, and the witness then stated that Jordan said, “he didn’t expect .any difficulty.” In this we think the court erred. The expression, too, was only part of what Jordan said; the balance of the conversation in which the expression was used may have explained or qualified it. The substance of no one portion of the conversation, without giving the whole, would have been admissible even ,in a civil suit.
Again, D. Landis was allowed, over the objection of the prisoner, to. state what Jordan said to him, under the following circumstances. After stating that Jordan thought he would die, witness said: '“I asked him what he went up to Fitzgerald’s and raised a difficulty and got shot for? He said he didn’t know what Dick (plaintiff in error), shot him for, and was about to> say something more when I stopped him.” It is manifest from this statement that- the deceased had n'ot, when stopped, completed all that he intended saying in response to the question 'asked him, by the witness.
This declaration of the deceased under such circumstances must be considered fragmentary, and too incomplete to be received as evidence, under the rule laid down by the authorities, 1 Greenleaf’s, 159, and Wharton’s Am. Criminal Law, sec. 674, etc., and in permitting it to go to the jury we think the court below erred. The objection to the dying declaration of the deceased, as testified to by Josiah Davis, we consider well taken. That statement of the deceased was complete in itself, and there was nothing to show that any further or any other statement was either-made or intended to be made by him, but it was not such *508 a dying declaration as was admissible under the rules of evidence.
The statement that "be (the deceased) was an innocent man; that he went there with no evil intentions,” tends in no way to identify the prisoner or connect him with the difficulty; nor does it constitute a part of the res gestae of the shooting. His intentions may not have been evil, and yet his acts may have a contrary impression in the mind of the prisoner. He may himself have had no evil intentions, while those accompanying him may have had.
The first clause of the sentence, that “he was an innocent man,” was not a question or matter of fact for him tc determine, and would be carrying the rule as to dying declarations too far to admit statements of this character.
Again, the court, over the objection of the prisoner, permitted evidence to go to the jury as to the general character of the decasad, for piety, and that he was a member of the church. This could hardly be warrantable under the rule admitting evidence of the character of the deceased for peaceableness, and in admitting such evidence the circuit court erred.
The material evidence in the case is in many respects very conflicting,. and in view of the respective positions of the parties at the time of the difficulty, and of the conflicting character of the evidence of the state and for the prisoner, 'as to what occurred at the house of Emily Bronson on the preceding Thursday evening, and on the morning of the shooting.
"W e are not satisfied with the correctness of the judge’s instructions to the jury upon the law of self-defense. The record discloses that there had been 'at the house of Emily Bronson, on the Thursday evening before the shooting, an interview between the deceased and the two Vinsons, on the one side, and the prisoner on the other, which was angry and denunciatory on the part of the former; and that there was also proof tending to show that the prisoner, *509 when he saw the same parties approaching his house on the following Saturday morning, expected or supposed that they were coming to attack or assault him; that having armed himself with a shotgun and stationed himself at the gate, where he remained until the deceased and one of the Yinsons came within speaking distance, when the prisoner ordered them to halt, but as to' the number of times they were halted and the other facts' connected with the shooting, the evidence for the state and the prisoner is so entirely conflicting, that we do not deem it proper to- comment on it or express any opinion as to its relative weight.
The circuit judge, after stating the general doctrine of the law of self-defense, proceeded to charge the jury as follows, viz.: “Further, to justify the killing upon the ground of self-defense, it must appear that the defendant had no means of escaping from the assault of the deceased,, and that is if he could have escaped without endangering the safety of his person. If the deceased assaulted the defendant with such violence, and in such manner as to endanger the personal safety of the defendant by attempting to escape, then he might well slay his adversary — provided he had not by his own wrongful acts, brought the danger upon himself, as before defined to you.”
The proviso to this instruction, as well as the qualifications annexed to the first part of the charge on self-defense, viz.: “Unless the proof shows that the danger of or to the defendant by which he was surrounded was brought on by his own wrongful act,” seem to mean, or -at least leave it to the jury to infer*, that the defendant’s act in going to the gate with his gun was in and of itself So wrongful (without regard to his intention in so doing), as to deprive him of the right to defend himself and repel a deadly assault.
The court further charged the jury, that “if you find the defendant, Richard, upon learning that the deceased, together with Yinson, was coming towards his mother’s *510 house, and that they were either armed or unarmed; and thereupon defendant armed himself with a deadly weapon, and advanced towards the deceased as far as his mother’s gate, and stationed himself there to await the coming of the deceased, with the view and intent of engaging in deadly combat with deceased, provided the deceased should assault him with a deadly weapon; and thereupon the deceased advanced near the gate and either did or did not assault the defendant, and thereupon defendant shot and killed the deceased, he is guilty of murder.”
This instruction ignores the fact that the defendant was upon his own premises, and' in effect deprives him of the right to make preparation for his defense against an expected deadly personal assault, and to select upon what portion of his premises he will receive and repel such assault. The law certainly did net require him to retire from any part of the curtilage. If the defendant went to the gate with the purpose and intent of seeking and provoking a deadly contest, and he did provoke it and kill the deceased in such conflict, then he would certainly he guilty of murder. The object, purpose and intent with which he advanced to the gate was an important question of fact. But under the above instruction, although he had gone to the gate with the most pacific and lawful purpose, but yet resolved to defend himself if assaulted, or only resort to force to repel force, he would nevertheless be guilty of murder if he killed deceased in resisting a deadly personal assault. We cannot assent to this mew of the law as applicable to the facts and circumstances of this case. We are of opinion that the proper instruction to have given on this branch of the charge was this: that if the defendant advanced to the gate, determined or intending not to fight unless for his defense and protection, and a violent and dangerous assault was made upon him, which threatened him with death or great bodily harm without his seeking or provoking it, and he killed his adversary to prevent his own death *511 or save himself from great bodily harm, it would be a killing in self-defense. This was in substance, the charge of the circuit judge in the case of Copeland v. The State, 7 Hum., 479.
The first instruction asked for by defendant covered this proposition, an'd should have -been given with the modification that the assault which threatened him with death or great bodily harm, originated “without his seeking or provoking it.” We have not noticed the other errors assigned and insisted upon in argument, as we deem them not well taken.
The judgment of the circuit court will be reversed and a new trial granted.